**REVISED**

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 95-10733

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

JAMES R. FISHER and JOHN R. CARNEY,

Defendants-Appellants.

Appeal from the United States District Court
for the Northern District of Texas

February 13, 1997

Before POLITZ, Chief Judge, SMITH and DUHÉ, Circuit Judges.

DUHÉ, Circuit Judge:

Defendants-Appellants James Fisher and John Carney appeal their convictions on several counts including bank fraud, mail fraud, wire fraud, conspiracy, and making false statements to the Federal Home Loan Bank Board and the Office of Thrift Supervision. For the reasons assigned, we reverse and vacate the convictions and remand for a new trial.[1]

---

[1] We note at the outset there is no double jeopardy issue in remanding for a new trial: "[T]he Double Jeopardy Clause's general prohibition against successive prosecutions does not prevent the government from retrying a defendant who succeeds in getting his first conviction set aside, through direct appeal or collateral attack, because of some error in the proceedings leading to conviction." Lockhart v. Nelson, 488 U.S. 33, 38, 109 S.Ct. 285,

**BACKGROUND**

In 1984, James Fisher, John Carney and Jeff Noebel[2] formed Equisource Realty Corporation as a real estate investment company in Dallas, Texas. By 1987, Texas real estate was no longer a profitable investment, and the Equisource Realty partners began to investigate other business opportunities.

At that time, the savings and loan industry was in disastrous condition. Many S&Ls had declared bankruptcy, and the federal government was faced with the unappealing reality of bailing out numerous failed institutions. In an effort to curtail the disaster, the Federal Home Loan Bank Board ("FHLBB") sought private investors to aid in the bailout.

To induce investment, bankrupt S&Ls were allowed to recognize "regulatory goodwill" as an asset. This goodwill was not recognized under Generally Accepted Accounting Principles, but was instead a creation of federal regulators. The goodwill asset created artificial capital for S&Ls without requiring investors to contribute hard dollars.

Equisource Realty became interested in acquiring an S&L in the summer of 1987. It targeted Bayside Savings and Loan Association in Port Charlotte, Florida, and applied for regulatory approval to purchase the institution. In the fall of 1987, Bayside had zero value, was $1,000,000 in debt and was losing $50,000 a month.

---

289 (1988).

[2]Jeff Noebel was indicted with Fisher and Carney but entered into a plea agreement and was not a defendant.

To acquire Bayside, the defendants and Noebel formed Equisource Capital Corporation to act as the general partner of a newly formed bank holding company, U.S. Savings Associates ("USSA"). Davis Hughes served as president of a sister organization, Equisource Financial Corporation.

Originally, USSA proposed to regulators it raise $3,000,000 for the acquisition: $2,000,000 in equity and $1,000,000 in debt. This proposal received approval. However, before closing, USSA opted to instead raise $4,000,000 in equity, with $875,000 of that sum subject to repurchase agreements. To accomplish this goal, USSA sold 80 units in USSA for $50,000 a unit to approximately 37 investors.

Some of the investors in USSA were represented by Joe Courrege, an agent for the financial interests of several NFL football players ("Players"). Courrege had purchased several homes in Dallas in the early eighties and then sold the homes to the Players as investments. By 1988, however, changes in the tax laws and the general decline of the real estate market had contributed to extremely high interest rates on the loans made to acquire the homes. Courrege was interested in refinancing these homes to decrease the monthly loan payments.

Early in 1988, Courrege learned of the USSA investment. As incentive to have his Players invest, USSA promised Courrege it would obtain refinancing on the Players' homes if the Players bought units in USSA.

Jeff Walker was represented by Courrege and sought to purchase

3

a USSA share. Jeff Walker's father Trent Walker deposited $10,000 with USSA for the purchase of one share, with the remaining $40,000 owed to be financed. Trent Walker was offered a repurchase agreement if the homes owned by his son were not refinanced by December 31, 1988. Both Walkers had trouble obtaining financing for the remaining $40,000 owed, so Trent Walker sent USSA a check for $40,000 in October 1988 to be placed in escrow until financing of the balance came through. That check was instead cashed by USSA.

Other investors were also promised repurchase agreements. Another Courrege client, Gary Hogeboom, invested $100,000 in USSA with the understanding his homes would be refinanced, and that his shares would be repurchased if such refinancing did not come through. Michael Barlerin purchased one unit in USSA in October 1988. Barlerin testified he was promised a repurchase agreement. Ramesh Mahtani, an investor who joined the Bayside Board of Directors, paid $250,000 for five units in USSA in October 1988. He also testified USSA promised him he could "put" the investment back to USSA within 18 months of the investment. Theodore Taub, another investor who joined the Bayside Board of Directors, purchased one unit for $50,000, and testified USSA promised him a repurchase agreement. Dennis Noebel, USSA partner Jeff Noebel's brother, bought a half unit with the understanding he could "put" the investment back.

Bradley Branson, a professional basketball player living abroad, purchased two units of USSA through his accountant Michael

4

Tannery. In September 1988, Tannery sent USSA a check for $20,000 on Branson's behalf, with the remainder of the purchase price to be financed. Tannery then sent another Branson account check to USSA in October for $20,000. Tannery claimed the check was sent by mistake. That check was cashed by USSA.

The USSA investment was beset with problems from the start. After promising refinancing to the players as an incentive to investment, USSA discovered that their homes had dropped significantly in value since their original financing, and that refinancing could only be obtained based upon the new worth of the homes. The Players believed that the homes could be refinanced without any out of pocket expense. In reality, large loan shortfalls would result, necessitating a hefty payment from the Players. Refinancing on the terms the Players had expected was not forthcoming.

The Bayside investment itself also received a severe blow. In 1989, Congress passed the Financial Institution Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. 101-73, 103 Stat. 183. FIRREA eliminated the regulatory goodwill offered by regulators as an incentive to purchase S&Ls. This severely restricted the amount of capital available in S&Ls using regulatory goodwill, and also limited the size of the S&Ls since their ability to lend was contingent on their capital reserves.[3] Bayside had

---

[3]In United States v. Winstar Corp., 116 S.Ct. 2432 (1996), the Supreme Court held that the United States breached its contracts to allow purchased savings and loans to use regulatory goodwill when it passed FIRREA. The Court also held the government could be liable for this breach. Bayside currently has a $5,000,000 action

5

used much of its original cash investment to pay off Bayside's debts to federal regulators, and had relied on the goodwill to support its capital base until the institution had recouped some of its losses. Bayside's capital base was reduced by FIRREA from close to $4,000,000 to around $800,000.

As well as vastly reducing operating capital, FIRREA greatly diminished the attractiveness of S&L investment. Many USSA investors were understandably nervous, and some of those with repurchase agreements with USSA sought to exercise them. However, after FIRREA, USSA no longer had surplus capital, and could not make good on all the repurchase agreements. Some of the parties involved sued USSA to enforce the buy back provision.

Michael Tannery, Bradley Branson's accountant, had difficulty obtaining a refund of his $20,000 overpayment for Branson's account. He testified that Fisher told him to apply for a loan from Bayside in Branson's name, and that Fisher and Carney would then repay the loan.

In its indictment against Carney, Fisher, Noebel and Hughes, the Government charged they conspired to commit mail fraud, wire fraud, and bank fraud, and also conspired to make false statements to and obstruct the operation of the FHLBB and Office of Thrift Supervision. The indictment then charged separate counts of mail fraud, wire fraud, making false statements, and bank fraud.

At trial, Fisher and Carney were found guilty of all charges against them. Hughes was acquitted. Fisher and Carney were

pending to recover losses it attributes to FIRREA.

sentenced to 87 months in prison, followed by five years' supervised release, and ordered to pay $895,000 in restitution. They now appeal.

## Discussion

The defendants assign numerous points of error to their trial proceedings.  We discuss certain of those points below.

### I.

Carney alleges the district court erred when it denied his motion for new trial because the Government impermissibly impeached him on cross examination with a constitutionally infirm conviction.

Several months before his trial in this case, a Texas court found Carney guilty of criminal contempt for failure to comply with a state court's turnover order.[4]  The judge in the contempt hearing also made many factual findings implying Carney had acted in a deceitful and unscrupulous manner.  Carney sought a writ of habeas corpus from the Texas Supreme Court.

While Carney's habeas application was pending, the present action went to trial.  Before Carney testified, the Government obtained a ruling allowing it to impeach Carney with the conviction and factual findings from the turnover action.  The district court held that Carney could have both the conviction and factual findings used against him if he chose to testify in his defense.

Notwithstanding this ruling, Carney chose to testify to

---

[4]According to Carney's testimony, Dennis Noebel filed a lawsuit to enforce his repurchase agreement.  USSA apparently settled with him.  Noebel obtained a final judgment against Carney in December 1993, and a hearing related to the satisfaction of that judgment resulted in the criminal contempt conviction.

explain his version of the events the Government was prosecuting. Because the Government had already obtained a ruling from the trial court allowing it to introduce the contempt conviction if Carney testified, Carney's attorney asked him about the contempt hearing and conviction on direct in an effort to ameliorate any forthcoming negative cross examination. Carney tried to explain his version of the events leading to the conviction: namely, that he had believed the hearing would be a restricted inquiry into the turnover of certain assets.[5] Contrary to Carney's expectations, the hearing quickly escalated into a very serious inquiry on the turnover order that resulted in the contempt conviction.

The Government made the contempt conviction and the accompanying factual findings a central element of its cross examination of Carney, subjecting Carney to rigorous interrogation on both topics.[6] The cross examination succeeded in making Carney

---

[5]Carney initially represented himself before realizing the seriousness of the hearing and retaining an attorney.

[6]The Government referred to the conviction in its cross examination repeatedly. The examination specifically addressed numerous factual findings made by the state court. Typical of the exchange between the Government and Carney are the following excerpts:

BY THE GOVERNMENT:
Q: You're no stranger to misrepresentations in court or out of court, are you, sir?
MR. CARNEY:
A: I don't know what that question asks me.
Q: Well, we know, do we not--you don't deny, or do you, that when Judge Hoffman convicted you of contempt he found that you had specifically made misrepresentations which justified the most severe impositions of sanctions? He found that, didn't he?
A: He did.
Q: And he sentenced you to jail for six months based on your

appear corrupt, untruthful, and dishonest.  In short, Carney's credibility was severely undermined by this questioning.

Soon after trial concluded and Carney was convicted, the contempt conviction was overturned by the Texas Supreme Court on the grounds Carney did not receive full and proper notice of the subject matter of the contempt motion, or when, how and by what means he was guilty of contempt.  Carney moved for a new trial in the present case on the ground that the use of the invalid conviction and factual findings was highly prejudicial to him.  He argued that his guilt or innocence rested on his credibility, and that "manifest and undue harm" was done to him by cross examination with an invalid conviction.  The district court denied that motion.

While Federal Rule of Evidence 609 specifically details the rules of impeachment at trial by evidence of prior conviction, past cases have carved out exceptions beyond the scope of that rule when an exception is necessary to protect the constitutional rights of

---

conduct, didn't he?
A:   That is on appeal and I disagree with his order and the notice upon which it was founded.
        * * *
Q:   [Judge Hoffman] specifically found, for example, that you had engaged in dilatory and harassing tactics for the purpose of delaying, didn't he?
A:   I believe that's in the order, yes.
        * * *
Q:   When you described the outcome of this matter on Friday, you said you were branded, right?
A:   Yes.
A:   And that's because you were branded for what you really are:  someone who's modus operandi is to engage in repeated intentional misrepresentations, deceptions and delaying tactics.  Isn't that the truth, sir?
A:   No, sir.
Record Vol. 14 at 82-110.

the accused.  For example, the Supreme Court has held that the admission of a prior criminal conviction at trial to support guilt or enhance punishment is impermissible if that conviction was invalid because it was obtained in violation of the defendant's right to counsel.  Burgett v. Texas, 389 U.S. 109, 115, 88 S.Ct. 258, 262 (1967).  Later Supreme Court cases reaffirmed this rule. United States v. Tucker, 404 U.S. 443, 92 S.Ct. 589 (1972); Loper v. Beto, 405 U.S. 473, 92 S.Ct. 1014 (1972).

This Court addressed the Burgett rule in Spiegel v. Sandstrom, 637 F.2d 405 (1981).  Defendant Spiegel's petition for habeas relief from a state conviction was granted by a federal district court.  The state appealed.  Spiegel argued his sentence in a trial for aggravated battery was enhanced because of a prior constitutionally invalid conviction for bribery, and that the prosecutor at trial prejudiced Spiegel by asking him if he had ever been convicted of a felony.  At the time of trial, the earlier conviction was pending on appeal.

After Spiegel was convicted of battery, his bribery conviction was overturned on two grounds.  First, the Florida Court of Appeals found Spiegel was denied effective assistance of counsel in violation of the Sixth Amendment.  Second, the appeals court stated illegally seized evidence was impermissibly introduced against Spiegel in violation of his Fourth Amendment rights.  Spiegel was retried for battery and acquitted.  This Court held the district court had properly granted habeas relief because the constitutionally infirm conviction should not have been used

10

against Spiegel.

The Spiegel Court stated:

> We perceive a major distinction between a prior conviction appealed on non-constitutional grounds and one, as here, appealed on the ground of violation of a Sixth Amendment right to counsel. . . .Here, Spiegel's guilt or innocence rested on his credibility. . . .[H]e was the sole witness to testify in his behalf. The Federal district court determined that manifest and undue harm was done to Spiegel through the introduction of his prior unconstitutional conviction. . . .

Spiegel, 637 F.2d at 407.

Carney argues that since the Texas Supreme Court found he was not given notice of the contempt motion or exactly how he was guilty of contempt, a violation of his due process rights, this Court should find that use of an invalid conviction obtained in violation of constitutional rights other than the Sixth Amendment was error for which Carney deserves a new trial. The conviction was not overturned for a technical error, but because of a substantive violation of his constitutional rights. He argues his credibility was of central importance at his trial, since the jury was forced to decide in several instances whether to believe Carney or the Government's witnesses. When he was made to appear a liar on cross examination, his character for veracity was impugned beyond repair.

The Government claims that Carney is not entitled to a new trial despite the introduction of an invalid conviction for numerous reasons. It first argues Carney waived his right to appeal the use of the conviction since he introduced it in direct examination, relying on United States v. Williams, 939 F.2d 721

11

(9th Cir. 1991), Shorter v. United States, 412 F.2d 428 (9th Cir. 1969), cert. denied, 396 U.S. 970 (1969), and United States v. Cobb, 588 F.2d 607, 613 (8th Cir. 1978), cert denied, 440 U.S. 947 (1979).

However, the Fifth Circuit has held a party is not prohibited from introducing evidence in direct examination when the trial court has already ruled the evidence may be introduced on cross examination. Reyes v. Missouri Pac. R.R. Co., 589 F.2d 791 (5th Cir. 1979). Plaintiff Reyes unsuccessfully attempted, through a motion in limine, to keep certain evidence excluded from trial. Anticipating introduction of the evidence by the defense, and "[i]n an attempt to minimize the damaging effects of his prior convictions, Reyes brought them out on direct examination." Id. at 793. On appeal, the defense argued Reves waived error by himself introducing evidence of the prior convictions. This Court refused to accept that argument, stating, "After the trial court refused to grant Reyes' motion in limine to exclude the evidence, he had no choice but to elicit this information on direct examination in an effort to ameliorate its prejudicial effect." Id. at 793 n.2.

Following our Reyes holding, we decline to agree that when opposing counsel obtains a ruling allowing it to introduce damaging evidence on cross, the affected party who attempts to anticipate that negative evidence waives his right to object to the introduction of that testimony by himself raising it. Clearly, no defendant would introduce damaging testimony unless he feared he would be more injured by the jury first hearing of that evidence

12

from the prosecution. When the Government obtains a ruling in advance allowing it to introduce prior conviction evidence, the defendant is faced with a difficult dilemma: to refrain from testifying in his own defense, or risk impeachment by the opposite side. A holding that, under these facts, a defendant who testifies in anticipation automatically waives his right to object to a trial court's ruling admitting the damaging evidence goes against basic notions of fairness. Therefore, when the prosecution obtains, over objection, a ruling in limine that it may use evidence of an earlier conviction if the defendant testifies, the defendant who introduces evidence of the conviction, later found to be constitutionally infirm, in direct examination in an effort to ameliorate the highly prejudicial effect of that evidence, should not be deemed to have waived objection to the erroneous introduction of such evidence.

The Government next relies on United States v. Galvan-Garcia, 872 F.2d 638 (5th Cir. 1989), cert denied, 493 U.S. 857 (1989), for the proposition that when a defendant attempts on direct examination to explain an earlier conviction, he may be cross examined on those facts. Id. at 640-41. However, that case shared none of the circumstances of Carney's case. First, Defendant Galvan-Garcia failed to object to the admission of evidence of a prior conviction at trial. The asserted evidentiary error was only reviewed for plain error. Second, the Government did not affirmatively seek a ruling allowing it to use the conviction, necessitating introduction by the defense of the damaging testimony

13

on direct. Third, and most important, the defendant was not impeached by the use of a constitutionally invalid conviction. The defendant suffered no manifestly unjust treatment from admission of a conviction that was properly admissible under Fed.R.Evid. 609, that he failed to object to at trial, and that he introduced on direct.[7]

The Government contends even if we find admission of Carney's contempt conviction erroneous, no new trial is required since the rule of Loper, that constitutionally invalid convictions may not be used to impeach a testifying defendant, has been subjected to a harmless error analysis. The Government argues it had such a plethora of evidence against Carney, the use of the invalid conviction against him at trial was not meaningful. We disagree. The Government used the contempt judgment and the findings made in connection with it as an integral part of its cross. As such, we cannot find the admission of the conviction to impeach Carney did not affect his substantive rights.

The Government avers that the rule of Burgett and Spiegel only applies to prior convictions obtained in violation of a defendant's

---

[7]Insofar as Galvan-Garcia suggests that a defendant waives any objection to the introduction of impeachment evidence when he offers evidence of prior convictions on direct examination, following an adverse ruling on a motion in limine concerning the admissibility of such prior convictions, we decline to follow that suggestion. See Galvan-Garcia, 872 F.2d at 640. As we have already explained, our decision in Reyes holds that a motion in limine is sufficient to preserve error for appeal under such circumstances, and we reaffirm that holding today. See Reyes, 589 F.2d at 793 n.2; accord Coursey v. Broadhurst, 888 F.2d 338, 341 n.3 (5th Cir. 1989); Petty v. IDECO, 761 F.2d 1146, 1152 n.3 (5th Cir. 1985), superseded on other grounds, Green v. Bock Laundry Mach. Co., 490 U.S. 504 (1989).

14

Sixth Amendment rights, and that a conviction invalidated for any other reason may be used against a defendant. We disagree. The rational of <u>Burnett</u> and <u>Spiegel</u> is equally applicable to this constitutional infirmity arising from lack of notice.

At oral argument, the Government cited the recent Supreme Court decision in <u>Custis v. United States</u>, 511 U.S. 485, 114 S.Ct. 1732 (1994) as further support for its position the invalid conviction was properly introduced against Carney. The Court held only defendants whose conviction was obtained in violation of their right to counsel could attack the validity of the earlier conviction at a later proceeding. However, <u>Custis</u> only addresses the right of a defendant in a federal sentencing proceeding to collaterally attack the validity of prior state proceedings. That case did not stand for the proposition that no inherent prejudice results when a constitutionally infirm conviction is used to impeach a defendant, so that the use of any constitutionally infirm conviction other than one obtained in violation of the right to counsel is <u>per</u> <u>se</u> acceptable.

The Government also refers us to <u>Smith v. Collins</u>, 964 F.2d 483 (5th Cir. 1992). Defendant Smith was impeached with several convictions found to be void because the indictments contained technical defects. This Court stated that since the factual reliability of the convictions was not in question, and since Smith never claimed he was innocent of the charges, there was no reversible error. We then distinguished the facts in <u>Smith</u> from those in <u>Loper</u>: "the use of the void convictions in <u>Loper</u> 'might

15

well have influenced the outcome of [that] case' because the issue of innocence and guilt 'turned entirely on whether the jury would believe the testimony. . .of Loper.'" Smith, 964 F.2d at 486 (quoting Loper v. Beto, 405 U.S. 473, 480 (1972)). Carney's case is far closer to that in Loper than in Smith. Carney protested his innocence against the charges of contempt. The Government relied heavily on the contempt conviction to cast doubt on Carney's character and truthfulness. As in Loper, the evidence against Carney was hardly overwhelming. Carney's word was an important part of his defense, and when the Government attacked him with the invalid conviction, Carney lost much of his credibility with the jury.

Finally, the Government states the conviction should have come in as probative of Carney's modus operandi of stalling and confusing investors. This argument is without merit. If the Government's position were allowed in this particular case, it would in effect be permitted to use circumstantial evidence of guilt to prove Carney's alleged ultimate crime. The limited allowances of Fed.R.Evid. 404(b) do not extend as far as the Government asks us to go.

Evidence of the contempt conviction was wrongly admitted against Carney, and merits reversal and remand for a new trial.


**II.**

Defendant Fisher appeals the trial court's refusal to grant him severance once evidence of Carney's contempt conviction was

16

introduced to the jury.

Fisher and Carney were indicted together, and tried together, for the same offenses. The two defendants attempted to present a uniform defense. During his opening statement, Fisher's attorney told the jury that Fisher and Carney's conduct was so connected the acts of both defendants should be considered collectively.[8] Fisher's attorney made these statements before he was aware the contempt conviction would be used against Carney.

After Carney testified on direct examination to his contempt conviction, Fisher unsuccessfully moved for a severance because of the introduction of such evidence before the jury. The devastating cross of Carney followed. At the close of evidence, co-defendant Hughes also moved for a severance. Because Fisher's attorney filed a motion before trial to adopt the motions and memoranda of co-defendants, both motions inured to his benefit to preserve the alleged error for appeal. United States v. Bernal, 814 F.2d 175, 182 (5th Cir. 1987).

Fisher argues that the introduction of the void contempt conviction against Carney caused a prejudicial spillover effect to Fisher's right to a fair trial and to his right to be judged independently by the jury. He cites Zafiro v. United States, 113 S.Ct. 933 (1993) for the proposition that severance was proper in

---

[8]In opening statements, Fisher's attorney told the jury:

Carney and Fisher's conduct, or lack of conduct, are intertwined about a hundred percent. It has to do with Fisher, it has to do with Carney. If it has to do with Carney, it has to do with Fisher. That's all there is to it.

17

his case.  The Court there stated:

> [A] district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.  Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant.  For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty.

Id. at 938.  Fisher contends that the contempt conviction and the acts constituting the alleged contempt would not have been admissible in evidence if Fisher had been tried separately from Carney, and that the jury could have attributed Carney's apparent wrongdoing to Fisher.  Fisher argues the apparent prejudice at the introduction of the contempt conviction was such he is entitled to a new trial.

The Government responds that whether to sever defendants is a matter within the trial court's discretion, and a denial of severance is only reviewable for abuse of that discretion.  United States v. Faulkner, 17 F.3d 745, 758 (5th Cir. 1994), cert denied, 115 S.Ct. 193 (1994).  Reversal is only warranted when the appellant can show compelling prejudice the trial court could not protect against--the rule, not the exception, is that persons indicted together should be tried together.  United States v. Pofahl, 990 F.2d 1456, 1483 (5th Cir. 1993).  "[T]he mere presence of a spillover effect does not ordinarily warrant severance."  Id. As well, a limiting jury instruction, such as one instructing the jury to consider each defendant separately, is often sufficient to

18

cure any risk of prejudice. <u>Zafiro</u>, 113 S.Ct. at 938-39.

Since we hold the invalid conviction should never have been introduced in this trial, we hold that even though midtrial severance is an extraordinary measure, warranted in very few cases, the damaging impeachment of Carney with an invalid conviction so poisoned the entire trial against both defendants as to render the verdict against Fisher suspect. Since Fisher's counsel announced to the jury Fisher and Carney had considered their actions to be intertwined, the destruction of Carney's credibility irreparably harmed Fisher. The instructions the jury received to consider each defendant and offense separately before returning a verdict were insufficient to protect Fisher.[9] Midtrial severance is an extraordinary measure, but as we believe the introduction of the invalid conviction against Carney was egregiously wrong, and since it could not have been admitted against Fisher if they had been separately tried, we find that Fisher was entitled to a severance when that evidence came in against his partner and co defendant.[10]

---

[9]The jury instruction stated in part:

> [T]he case of each defendant should be considered separately and individually. The fact that you may find one or more of the defendants guilty or not guilty of any of the crimes charged should not control your verdict as to any other crime or any other defendant. You must give separate consideration to the evidence as to each defendant.

[10]Our conclusion that Fisher was entitled to a separate trial, under the unique circumstances of this case, does not signal a retreat from the general principle that the mere "spillover" effect of damaging evidence introduced against one defendant is insufficient to warrant the severance of other defendants. <u>See e.g.</u> <u>United States v. Broussard</u>, 80 F.3d 1025, 1037 (5th Cir.), <u>cert. denied</u>, 117 S.Ct. 264 (1996); <u>United States v. Mitchell</u>, 31 F.3d 271, 276 (5th Cir.), <u>cert. denied</u>, 115 S.Ct. 455 (1994);

19

## III.

Fisher alleges that Count One of the indictment alleged four separate and distinct conspiracies, and was therefore duplicitous under Fed.R.Crim.P. 8(a) and should have been dismissed. He moved before trial to dismiss Count One for this reason, but the district court informed him it would cure the error in the jury instructions. Fisher apparently felt the instruction was insufficient to cure any error, and argues that a duplicitous indictment subjected him to prejudice in obtaining appellate review and the prevention of double jeopardy, and risked a non-unanimous jury verdict.

A conspiracy may have more than one object without making the indictment alleging that conspiracy duplicitous. United States v. Duvall, 846 F.2d 966, 975 (5th Cir. 1988).

> [A] single count may be used where those actions "represent a single, continuing scheme," provided the indictment (1) notifies the defendant adequately against the charges against him; (2) does not subject the defendant to double jeopardy; (3) does not permit prejudicial evidentiary rulings at trial; and (4) does not allow the defendants to be convicted by a nonunanimous jury verdict.

United States v. Baytank (Houston), Inc., 934 F.2d 599, 609 (5th Cir. 1991). However, "[i]f an indictment is duplicitous and prejudice results, the conviction may be subject to reversal." Id.

---

Pofahl, 990 F.2d at 1483. To the contrary, the Supreme Court has instructed us to consider the risk of prejudice on a case-by-case basis. Zafiro, 506 U.S. at 539. Therefore, although we conclude that Fisher has demonstrated "compelling prejudice" warranting reversal of his conviction, see Pofahl, 990 F.2d at 1483, we limit our holding to the extraordinary circumstances of this case.

at 608.

Fisher only alleges he was prejudiced by subjection to double jeopardy and conviction by a nonunanimous jury verdict. The indictment against Fisher did not subject him to double jeopardy. The classic test for resolving issues of double jeopardy was set out by the Supreme Court in Blockburger v. United States, 284 U.S. 299 (1932). Blockburger directs that double jeopardy concerns are not raised if each crime charged requires an element of proof the other crimes charged do not. Id. at 304. The Supreme Court recently reaffirmed this "same elements" test, stating that "where the two offenses for which the defendant is punished or tried cannot survive the 'same elements' test, the double jeopardy bar applies." United States v. Dixon, 113 S.Ct. 2849, 2856 (1993). This Court has also relied frequently on the Blockburger test. United States v. Gonzales, 40 F.3d 735, 738 n.5 (5th Cir., 1994); Bias v. Ieyoub, 36 F.3d 479, 480.[11]

---

[11]Several years ago, in United States v. Marable, 578 F.2d 151 (5th Cir. 1978), this Court first set out a test to resolve when an indictment risks exposing a defendant to double jeopardy. That test asked "whether the proof for charges in a second indictment would have been admissible in the first trial and would have supported a conviction." United States v. Robin, 693 F.2d 376, 378 (5th Cir. 1982) (citing Marable, 578 F.2d at 153.) In 1980, however, this Court, in an en banc decision, discredited the analysis in Marable, holding the better interpretation of Blockburger is one that focuses "on the *elements* of the offense charged, *not* on the evidence adduced at trial." United States v. Rodriquez, 612 F.2d 906, 919 (5th Cir. 1980) (en banc), aff'd, 450 U.S. 333 (1981), overruled on other grounds, United States v. Michelena-Orovio, 719 F.2d 738, 757 (5th Cir. 1983) (en banc), cert. denied, 465 U.S. 1104 (1984).
For that reason, we feel the Blockbuster "same elements" test is the test we should use to resolve Fisher's claim. We recognize that this Court has cited the Marable test even after Rodriquez was decided. Robin, 693 F.2d at 378. However, the abundance of

Under the "same elements" test, the indictment did not subject Fisher to double jeopardy. Each part of the conspiracy charged in Count One required proof of its own element. No double jeopardy concerns were raised.

The danger of a nonunanimous jury verdict may be avoided by proper jury instructions. Baytank, 934 F.2d at 609. The judge instructed the jury on the burden of proof the Government was required to meet before they could find the defendants guilty. The judge also gave the jury a specific instruction that while they need not find the defendants committed each of the five offenses alleged in the indictment, they must unanimously agree the defendants committed at least one of the five offenses alleged to have made up the conspiracy. The jury instructions in this case were sufficient to cure any alleged defect in the indictment.

Fisher has not made the necessary showing of prejudice to merit reversal on this ground. In Robin, we noted that a duplicitous indictment is not reversible error if defense preparation was not affected and the jury's verdict is unambiguous. Robin, 693 at 379. We do not find either condition occurred in this case. Any alleged duplicity in the indictment did not cause any prejudice and was harmless.

---

authority endorsing the "same elements" test leads us to believe that is the better standard.

We also note that regardless of which test we use, Fisher's claim fails. Under the Marable test, each element of Count One was supported by adequate, separate evidence, so that none of the evidence could be used as the basis for a future indictment.

22

**IV.**

Both defendants allege the district court erred when it refused to admit evidence that the defendants had prevailed in an arbitration proceeding between themselves and four of the NFL players seeking to have their USSA shares repurchased. The defendants argue their success in arbitration showed the legitimacy of their position the athletes had breached their contracts with USSA and were not entitled to repurchase contracts. The district court excluded the evidence under Fed.R.Evid. 402 and 403, concluding the risk of confusing and misleading the jury with the evidence outweighed its probativity.

This evidence was highly relevant. Evidence that an arbitration proceeding occurred and that the defendants were not found obliged to repurchase the Players' shares goes to the heart of the case. The objections the Government had to this evidence-- namely, that the arbitrator did not detail his reasons for the finding, and that the jury might not understand they were not bound by the arbitrator's decision--may be pointed out in cross examination on these subjects and argued to the jury. The defendants have been found guilty of a crime and sentenced to substantial jail terms. Evidence that is so relevant must be extremely prejudicial to warrant its exclusion in these circumstances. The arbitration results are not so inherently confusing that the defense should have been prevented from introducing them.

The Government also argues a civil judgment is not admissible

23

in a criminal case, particularly when the Government is not a party to both matters.  <u>Wharton's Criminal Evidence</u>, § 669 (14th ed. 1985).  However, the arbitration results were not offered to prove innocence, but to show that contrary to the Government's assertions, the defendants' legal position against the Players was not a "ruse" or a position taken in bad faith.  Also, as the defense notes, several of the Government's own witnesses mentioned the results of other civil litigation against USSA.  If civil actions against the defense where the defense was unsuccessful were mentioned in testimony, Fisher and Carney should have been allowed to discuss the results of arbitration they won.  It was error to exclude this evidence.

**V.**

Michael Tannery, the accountant for Bradley Branson who mistakenly overpaid USSA by $20,000, testified at trial.  He stated when he tried to obtain a refund of the $20,000 overpayment, Fisher advised him to take out a loan at Bayside in Branson's name, and Fisher and Carney would later repay that loan.

Tannery was the central witness against Fisher on the bank fraud charge, Count Ten of the indictment.  Tannery testified to the grand jury and again at trial that Brad Branson was aware of the loan from Bayside when it was requested.

Before trial, Fisher's counsel had successfully filed a "Motion for Production of Favorable Evidence," which included information affecting the credibility of any person called as a

24

witness by the Government.  The Government answered it was unaware of any Brady[12] material at that time.  After Tannery testified, the defendants filed a specific motion seeking Brady material relating to Tannery.  At that point, the Government submitted to the defense an FBI 302 report from November 1992 of an interview with Bradley Branson.  In that interview, the FBI learned Branson did not request the loan from Bayside, he did not request Tannery to obtain a loan, and he was unaware a loan was requested in his name.  He did not know why the loan was requested or how the proceeds were used.  This evidence was directly contradictory to what Tannery testified to both in the grand jury hearing and at trial.  The Government did not at any point attempt to correct the inconsistent testimony.

When the defense received the 302 report, on the last day of trial, Carney's counsel moved for a mistrial due to the Government's failure to provide the information in a timely manner. The court overruled the motion because it stated it did not think the report was inconsistent with other testimony, and that no one had attempted to have Branson appear as a witness, or if Branson were unavailable,[13] to take a deposition for use at trial.

In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court held the suppression by the prosecution of material evidence favorable to the accused violates due process.

To prevail on a Brady claim, petitioner must prove that

---

[12]Brady v. Maryland, 373 U.S. 83 (1963).

[13]Bradley Branson lives in Spain.

25

(1) the prosecution suppressed or withheld evidence (2) which was favorable to the defense and (3) material to either guilt or punishment. Materiality requires the petitioner to demonstrate that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.". . .[A] reasonable probability is shown when the non-disclosure "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the jury verdict."

Westley v. Johnson, 83 F.3d 714, 725 (5th Cir. 1996), petition for cert filed, No. 96-6205 (Sept. 30, 1996)(citations omitted).

Fisher argues that Tannery was the critical witness against him on Count Ten, a count on which he was found guilty and sentenced to 87 months in prison. Even though the Government had been ordered to turn over all evidence that might affect the credibility of its witnesses before trial began, the Government did not disclose the report to the defense in time for it to make a meaningful difference in their trial strategy. Fisher contends no effort was made to depose Branson or have him appear at trial because the defense was unaware Branson did not know of the loan when it was requested, or that Branson had disclaimed Fisher was responsible for the loan. He argues the information in the 302 report would have severely impeached the credibility of Tannery. Since Tannery was the key witness against him on Count Ten, and since Tannery's believability was critical to a jury finding of guilt on that count, disclosure of the 302 would have made a different result reasonably probable, as required to prevail under Brady and its progeny.

The Government claims that while the 302 did contradict Tannery's testimony, Branson's statements were not material. It

26

argues that the withheld 302 could not have exculpated Fisher or impeached Tannery on essential issues, and that much other evidence was presented that proved Fisher's guilt. For those reasons, the failure to disclose the 302 did not undermine confidence in the verdict.

While the 302 would not have directly exculpated Fisher, it would have severely impeached the testimony of a key government witness. As Tannery was the essential witness against Fisher on Count Ten, any evidence tending to discredit his testimony would have been valuable to the defense. The Government knew of the 302 and that Branson directly contradicted Tannery's evidence. Had the defense known of the 302, it could have deposed Branson and had his testimony contradicting Tannery ready for trial. The Government's failure to release this material information to the defense was error, and should have resulted in a new trial for Fisher.

## VI.

Both Fisher and Carney allege insufficient evidence was produced to support Count Seven of the indictment, making false statements under 18 U.S.C. § 1014. The indictment alleged Fisher and Carney submitted an affidavit to the FHLBB which "falsely stated that no material adverse events or material adverse changes" occurred with respect to the financial condition of USSA since the defendants submitted their application to buy Bayside. This application represented that USSA would be capitalized with $2,250,000 in equity and $1,000,000 in debt. After submitting the

27

affidavit, however, USSA restructured its capital and increased equity to $4,000,000, but with $875,000 of that sum subject to repurchase agreements and no debt.  Defendants did not report this change and contend it was not an adverse event.  They certified that no material adverse change had occurred.

The Government disagrees.  It claims that the FHLBB should have been told this information since demand repurchase agreements affected the timing of when funds would come due.  It points out a defense witness testified he would want to know about repurchase agreements in deciding whether to approve an application for change in control.  It then notes the defendants made no provision for repayment of the sums included in the buy back agreements, creating a risk of bankruptcy.  The fact that equity was increased and debt decreased does not end the inquiry.

"To overturn the convictions on a sufficiency of the evidence challenge, we must find that a rational trier of fact could not have found that the government proved the essential elements of the crime charged beyond a reasonable doubt."  <u>United States v. Jimenez</u>, 77 F.3d 95, 97 (5th Cir. 1996).  When we view the evidence in this light, we cannot find the verdict so unsupported as to merit reversal.  The change in capitalization created, in effect, a sizable debt payable on demand.  No provision was made for repayment of this debt.  This created a danger that several investors would seek repayment at the same time and drain Bayside of operating capital.  While we are sympathetic to the impact of FIRREA on Bayside, the fact that Bayside was unable to repay its

28

liabilities when investors sought to exercise repurchase options illustrates the dangers inherent in these liabilities.  There was sufficient evidence to support the verdict on these counts.  The information withheld was adverse.

## CONCLUSION

As we find the district court erred and reverse its decision, we do not reach the remaining contentions on appeal.  We REVERSE Appellant's convictions, VACATE their sentences and REMAND.