**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Gene E. BARRETT, Defendant–Appellant.**

**No. 93–3233.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 15, 1994.

Decided March 23, 1995.

Daniel P. Bach, Asst. U.S. Atty., Madison, WI (argued), for plaintiff-appellee U.S.

Martin I. Hanson, Hanson, Gasiorkiewicz & Weber, Racine, WI (argued), for defendant-appellant Gene E. Barrett.

Before COFFEY, RIPPLE, and ROVNER, Circuit Judges.

ROVNER, Circuit Judge.

Gene Barrett pled guilty to two counts of making false statements to a federally insured lending institution in violation of 18 U.S.C. § 1014. (R. 26). Barrett was sentenced to twenty-one months' imprisonment and a one-year term of supervised release. Additionally, the court ordered Barrett to pay restitution in the amount of $183,043.61 to Anchor Savings & Loan and $748,875.44 to Old Republic National Title Insurance Company, the successor to the Title Insurance Company of Minnesota. On appeal, Barrett argues that the court erred by increasing his offense level by 10 pursuant to U.S.S.G. § 2F1.1 because (1) the loss of $748,875.44 incurred by Old Republic was not a loss by a "victim" under § 2F1.1, and (2) the loss of $183,043.61 incurred by Anchor Savings was not a "loss" under § 2F1.1.

## I.

In May of 1984, Barrett and John Bosshard entered into a partnership called "Seminole Associates" for the purpose of purchasing and developing real estate in Fitchburg, Wisconsin. Seminole Associates borrowed $2,500,000 from First Federal Savings and Loan Association ("First Federal") of LaCrosse, Wisconsin. The loan was secured by a blanket mortgage on all of the real estate owned by the partnership. The loan agreement provided that First Federal would execute partial releases of the mortgage upon payment of a fixed dollar amount for each lot that the partnership sold. This arrangement enabled the partnership to sell the lots to third parties unencumbered, so that these purchasers could in turn secure their own mortgages on the lots. Barrett employed Badger Abstract and Title Corporation of Madison, Wisconsin ("Badger") to obtain title commitments and title insurance. Badger was owned and underwritten by the Title Insurance Company of Minnesota ("Minnesota Title").

Ordinarily, a title insurance company will not issue a "clear" title commitment on land that is mortgaged without proof that the mortgage has been satisfied. Absent the appropriate documentation, the title commitment will acknowledge the existence of a prior and superior mortgage to which any new security interests will be subordinate. Badger followed this practice initially.

However, in early 1987, Barrett approached Frank Alvstad, the agent at Badger assigned to handle Seminole Associates work, and showed him five checks, each in the amount of $26,000, that purportedly were to be sent to First Federal to satisfy its mortgage on five lots. Barrett told Alvstad that he was in a hurry to begin construction on the lots and asked Alvstad to issue clear title commitments for them. Barrett told Alvstad that he would send the checks to First Federal himself and that First Federal would then send partial mortgage releases to Badg-

er. Alvstad testified that based on his prior satisfactory dealings with Barrett and his belief in the financial soundness of Seminole Associates, he expected that Barrett would in fact send the checks and that the releases would be forthcoming. Alvstad did as Barrett requested and issued clear title commitments without actually receiving either the checks or the releases from First Federal. From that point on, this procedure became the norm; Barrett would display to Alvstad one or more checks payable to First Federal for the partial release of its mortgage and Alvstad would issue clear title commitments for the lots for which releases were sought. But, contrary to Alvstad's expectation, Barrett was not sending the checks to First Federal; and Badger would eventually discover that it had issued clear title commitments on thirty-two lots on which First Federal still held a first mortgage.[1]

In addition to his false representations to Badger, Barrett also made misrepresentations to Anchor Savings and Loan of Madison, Wisconsin ("Anchor") in connection with four construction loans obtained from Anchor. Barrett assured Anchor that the lots pledged as collateral were free of existing liens, when in fact First Federal (and, in one instance, First Financial Savings Association of Stevens Point, Wisconsin) continued to hold mortgages on the lots.

When Barrett's partner, John Bosshard, discovered that Barrett had been obtaining loans by mortgaging real estate that was already encumbered, Bosshard required Barrett to sign an agreement dissolving the partnership and signing over to Bosshard all of Barrett's interest in the properties owned by Seminole Associates. Barrett subsequently defaulted on the various loans.

In order to meet its title commitments upon Barrett's default, Minnesota Title, which had underwritten the policies issued by Badger, negotiated a mortgage assignment from First Federal in exchange for $423,000. The assignment caused the mort-

---

1. Barrett also caused Badger to issue clear title commitments for three lots on which Community National Bank of Oregon, Wisconsin held a first mortgage. Indeed, although the mortgage contract with Community National prohibited the lots from being sold or transferred without permission of the bank, Barrett sold two of the three lots to third parties without either satisfying Community National's mortgage or obtaining its permission.

gage originally held by First Federal to become subordinate to any subsequent mortgages, as would have been the case had the property truly been unencumbered as the clear title commitments reflected. The subordinate mortgage now held by Minnesota Title was of no value. Minnesota Title similarly purchased a note and mortgage from Anchor for $233,467.36 in order to fulfill Badger's obligations to Anchor. This mortgage thus became subordinate to a mortgage held by First Financial Savings of Stevens Point and, like the assignment obtained from First Federal, worthless. Finally, Minnesota Title paid $83,408.08 for mortgages held by Community National Bank, in order to fulfill the insurance obligations undertaken by Badger in connection with title commitments it had issued based on Barrett's false representations.

In total, Minnesota Title paid $748,875.44 to either first or second mortgage holders in order to satisfy insurance obligations undertaken by Badger. As a consequence of these pay-outs by Minnesota Title, only Anchor Savings suffered losses due to Barrett's conduct. Although Anchor's mortgages on three of the four lots (they suffered no loss with respect to the fourth lot) were no longer subordinate to the First Federal mortgage once Minnesota Title paid off First Federal, due to a decrease in the market value of the lots Anchor lost $183,043.61 when it elected to sell the foreclosed property.

## II.

Pursuant to the Victim and Witness Protection Act, the district court ordered Barrett to pay $748,875.44 in restitution to Old Republic, the successor to Minnesota Title, for the sums Minnesota Title had paid to reimburse the financial institutions, and another $183,043.61 to Anchor to cover its losses. *See* 18 U.S.C. § 3663(e)(1) (authorizing the court to award restitution "to any person who has compensated the victim");

see also *United States v. Marlatt*, 24 F.3d 1005, 1007 (7th Cir.1994) (monies spent by title insurer to clear titles are included as "loss" under U.S.S.G. § 2F1.1).[2] The district court also increased Barrett's offense level by ten levels based on the magnitude of the loss in accordance with U.S.S.G. § 2F1.1(b)(1).

### A.

Barrett argues that the district court erred when it increased his offense level under § 2F1.1 based on the amount of money Minnesota Title (and thus Old Republic) lost. Barrett asserts that Old Republic is not a "victim" who suffered a "loss" within the meaning of § 2F1.1 because Frank Alvstad, Badger's employee, was Barrett's accomplice in the commission of the crime.[3]

The meaning of "victim" and "loss" for purposes of § 2F1.1 is a question of law that we take up de novo. *United States v. Holiusa*, 13 F.3d 1043, 1045 (7th Cir.1994). This court has not previously defined the scope of the term "victim" under § 2F1.1 of the Guidelines. However, common sense dictates that when an employee acts to the detriment of his employer and in violation of the law, his actions normally will be deemed to fall outside the scope of his employment and thus will not be imputed to his employer. *See United States v. One Parcel of Land*, 965 F.2d 311, 316 (7th Cir.1992) (an "agent is outside the scope of his employment when he is not acting at least in part for the benefit of the corporation, and any knowledge the agent obtains is not imputed to the corporation"). Thus, even if Alvstad did participate in Barrett's illegal activities, Alvstad's actions should not be imputed to his employer (or to Badger's corporate parent) given that such actions were illegal and in no way beneficial to the company. Alvstad himself testified that his practice of issuing clear title commit-

---

**2.** The plea agreement provided that Barrett would pay restitution for all losses caused by the offenses of conviction, as well as all losses caused by the same course of conduct or common scheme or plan as the offenses of conviction. Accordingly, the district court was not limited to awarding restitution only for losses stemming from the offenses of conviction, and the defen-

dant has not so argued. *See* 18 U.S.C. § 3663(a)(3).

**3.** Alvstad was not indicted on any criminal charges arising from or related to Barrett's illegal activities.

ments without first obtaining a release or check was a deviation from company policy of which Badger was completely unaware. There is also no evidence suggesting that either Minnesota Title or Badger authorized Alvstad's actions. Accordingly, Old Republic (as successor to Minnesota Title) qualifies as a victim within the meaning of § 2F1.1, whether or not Alvstad acted in concert with Barrett. The district therefore committed no error in calculating Barrett's offense level based in part on the $748,875.44 that Minnesota Title expended to rectify the title defects.

## B.

■ Barrett next argues that the district court erred in finding that the loss of $183,043.61 incurred by Anchor Savings was a "loss" by a victim under § 2F1.1. Anchor made several loans to Barrett, each secured by a separate plot of land. Barrett defaulted on all of the loans and Anchor as a secured creditor took possession of the land pledged as collateral. Anchor had granted these loans under the mistaken belief that the land mortgaged to secure each loan was unencumbered when in fact, Anchor's mortgages were subordinate to the blanket mortgage held by First Federal. However, upon discovery of Barrett's illegal activity, Minnesota Title purchased an assignment from First Federal. The assignment subordinated the mortgage originally held by First Federal to Anchor's subsequent mortgage. Thus, when Barrett defaulted on the loans, Anchor, as the superior mortgagee, was able to foreclose upon and auction the property. The $183,043.61 loss that Anchor suffered represents the difference ·between the amount Barrett owed on the loans and the amount that Anchor was able to recoup by selling the land.

The government argues that this is a loss cognizable under § 2F1.1 because "Anchor would never have granted the loans to the defendant had he disclosed the true status of the lots mortgaged to Anchor, thereby revealing as well a more accurate picture of his financial situation." But Barrett suggests in response that once Minnesota Title intervened and Anchor's mortgages moved ahead

of all other liens on the mortgaged property, Anchor received what it bargained for when it loaned the money to the defendant. At that juncture, Barrett contends, any loss that Anchor suffered was a loss attributable to the risks of the marketplace rather than to Barrett's criminal behavior.

In *United States v. Marlatt, supra* (decided after Barrett was sentenced), we determined that a drop in market value could not be included in the loss calculation under § 2F1.1. 24 F.3d at 1007.[4] In *Marlatt*, the defendant knew but did not tell either the purchasers or the title insurer that his resort condominiums were heavily encumbered by liens for unpaid taxes, judgments, and mortgages. When the title insurer discovered the defendant's fraud, it purchased the liens and mortgages, thereby clearing the titles. However, the value of the property had plummeted in the meantime because the defendant had closed the associated resort. To avert suit by the purchasers of the condominiums, the title insurer repurchased all the units at the price at which the purchasers had bought them from the defendant. This court held that the fact that the purchasers would not have purchased the time shares had it not been for the title insurance policies did not make the title insurance company an insurer against a drop in the real estate market, for "the loss in [market] value was not caused by the defective titles." *Id.* at 1007. Thus, the money spent by the title insurer to repurchase the units was not a loss within the meaning of § 2F1.1:

> Application Note 7(b) distinguishes between loss on the one hand and consequential and incidental damages on the other and makes clear that with irrelevant exceptions the latter two items are not to be counted in computing loss for purposes of sentencing under this guideline. The reason for the distinction is no doubt to prevent the sentencing hearing from turning into a tort or contract suit. The distinction is nicely illustrated by this case. The defendant extracted from Ticor [the title insurer] by fraud a bunch of insurance policies on which Ticor was required to make

4. The parties were given the opportunity to comment on *Marlatt* via supplemental briefing.

good to the tune of $476,000. This was the loss. In the wake of the loss Ticor incurred other expenses, which were consequences, perhaps even foreseeable consequences, of the fraud, but were not the thing actually taken from Ticor, the loss; the thing taken was the promise to insure and the cost of honoring that promise was $476,000.

24 F.3d at 1007. *See also United States v. Daddona*, 34 F.3d 163, 172 (3d Cir.) (collecting cases), *cert. denied*, —— U.S. ——, 115 S.Ct. 515, 130 L.Ed.2d 421 (1994).

At first glance, *Marlatt* would seem to apply to the facts of this case. When it made the loans to Barrett, Anchor was aware of the risk of default and contemplated being able to take possession of the land in the event a default occurred. What it did not know was that First Federal held a superior mortgage that might preclude Anchor's resort to this remedy. Yet, once Minnesota Title purchased assignments from First Federal, Anchor's mortgage in effect became, as Barrett had represented, the only mortgage on the property. Thus, Anchor was able to foreclose on and sell the property, thereby recouping as much of its loss as the market permitted, just as it had originally contemplated. It would be an entirely different case had Minnesota Title not purchased the assignments from First Federal; then Anchor's mortgage would have remained subordinate to that of First Federal and, due to the drop in market value, it would have been worth nothing at all.

Both *Marlatt* and this case involve the same consequential, albeit foreseeable loss. True, in this case the title insurer did not buy the property back at the original market value, thereby shouldering the entire loss; instead, Anchor was left to bear the loss when it sold the property at a depressed price. But the result in *Marlatt* would not have been different if the title insurer had declined to step in to repurchase the units and the property owners (like Anchor) had elected to sell their property at a loss. A loss due to reduced market value, whether it is borne by the property owner or the title insurer, is consequential and is not a loss attributable to the title fraud. 24 F.3d at

1007. The "promise" made by the title insurer is no more than "a promise to make the purchasers whole (up to the policy limits) for any *defects in the title.*" *Id.* at 1006–07 (emphasis supplied). To fulfill this promise, the title insurer must "ma[ke] good the damage caused by the title defects by removing the defects." *Id.* at 1007. By doing so, the title insurer restores the property owner to the position for which it originally bargained. And so Minnesota Title did for Anchor. The loss that Anchor subsequently suffered when it foreclosed on the property and then sold it ($183,043.61), is consequential—no different than the loss that the condominium owners in *Marlatt* would have incurred had the title insurer not intervened, and no different than the title insurer did incur as a consequence of its generous buy-back.

However, because Anchor is a federally-insured lending institution, its loss, unlike the harm posed to the *Marlatt* condominium owners, springs from a cause independent of the fraud and resultant harm perpetrated by the defendant on the title insurer. In *Marlatt*, the defendant's fraud ultimately did not directly harm the condominium owners: Marlatt represented that the condominiums were free of any prior encumbrances, and following the title insurer's assignments, the condominiums were as represented. Although the same is true here—after Minnesota Title's purchase of the assignments, the property owned by Anchor by reason of the foreclosure was as represented—a second fraud occurred. 18 U.S.C. § 1014 makes it illegal to "knowingly make[ ] any false statement or report, or willfully overvalue[ ] any land, property or security, for the purpose of influencing in any way the action of . . . any bank the deposits of which are insured by the Federal" government. When Barrett failed to disclose the encumbrances on the property he offered as collateral, he effectively misrepresented his true financial condition to Anchor and precluded the bank from assessing the actual likelihood of his defaulting on the loans. This misrepresentation thus provides a basis for indictment (Count IX) independent of the fraud perpetrated on Minnesota Title; and Anchor's loss, although consequential with regard to Barrett's misrepresentation to the title insurer, may be consid-

ered a direct loss vis à vis his misrepresentation to Anchor. Application Note 7(b) to § 2F1.1 is directly on point: "the loss in a situation where a defendant fraudulently obtains a loan by misrepresenting the value of his assets is the amount of the loan not repaid, less the amount recovered from the sale of collateral." U.S.S.G. § 2F1.1, comment. (n. 7) (Nov. 1992).[5] This is precisely the manner in which the district court arrived at the $183,043.6₁ loss attributed to Anchor. Consequently, the court committed no error in adding this amount to Old Republic's loss for purposes of computing Barrett's offense level.

### III.

For the foregoing reasons, we AFFIRM the sentence imposed by the district court.

---

5. The 1992 Guidelines apply because the district court sentenced Barrett on September 10, 1993, prior to the effective date (November 1, 1993) of the 1993 Guidelines. (R. 26).